UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RASHAD ABDUL-MATIN

       *Plaintiff,*

-against-

CORRECTION OFFICER JOSHUA
BARTLETT; CORRECTION OFFICER
SHANE BOWER; SERGEANT FRANCIS
CHANDLER; SERGEANT WILLIAM
DUNDON; DEPUTY COMMISSIONER OF
CORRECTIONAL FACILITIES MICHAEL
D'AMORE; SERGEANT DAVID
FERRONE; CORRECTION OFFICER
MICHAEL GERHARDT;
SUPERINTENDENT BRYAN HILTON;
CORRECTION OFFICER MICHAEL G.
JONES; CORRECTION OFFICER CRAIG
KLEMICK; CORRECTION OFFICER
JONAH LEVI; CORRECTION OFFICER
STEVEN MACK; COMMISSIONER
DANIEL F. MARTUSCELLO, III;
CORRECTION OFFICER SCOTT
MONNAT; CORRECTION OFFICER
CHRISTOPHER PERRI; CORRECTION
OFFICER BRETT RADLEY; SERGEANT
RYAN RUSSELL; CORRECTION OFFICER
TRISTAN SHEPPARD; and JOHN AND
JANE DOES 1-20, as yet unidentified
individuals,

       *Defendants*.

Civil Case No.   9:26-cv-1551 (BKS/ML)

**COMPLAINT AND
JURY DEMAND**

U.S. DISTRICT COURT – N.D. OF N.Y.

FILED

**Aug 12 - 2026**

John M. Domurad, Clerk

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................................1

JURISDICTION AND VENUE ......................................................................................................2

JURY DEMAND ............................................................................................................................2

PARTIES .........................................................................................................................................2

STATEMENT OF FACTS ..............................................................................................................5

The Attack on Rashad Abdul-Matin on February 27, 2025 ...........................................................5

Defendants D'Amore, Hilton, and Martuscello are Responsible for the Assault on Mr. Abdul-Matin ...............................................................................................................................................12

The Marshall Project and New York Times Investigation Reports ..............................................16

Recent Jury Verdicts, Settlements, and Criminal Pleas Reveal Persistent Physical Violence and Abuse Across DOCCS Facilities ..................................................................................................20

A Second Marshall Project and New York Times Investigation Reports Pervasive Pattern of Coverups Across DOCCS Facilities .............................................................................................23

Prisoners' Rights Advocates Warned Defendant Martuscello of the Risk of Violence Against Incarcerated Individuals ...............................................................................................................25

Defendants D'Amore, Hilton, and Martuscello Were Aware of and Deliberately Indifferent to Decades of Rampant Violence by Correction Officers at Mid-State .........................................27

Thirty Correction Officers Conduct a Violent Raid at Mid-State in 2016 ................................28

CANY's 2023 Monitoring Report Details Widespread Physical Abuse by Staff at Mid-State 30

Correction Officers Brutally Beat James Barton at Mid-State in 2023 ......................................33

Defendants Levi, Gerhardt, and Jones Assault Shayzon Taylor at Mid-State in 2023 ..............34

CANY's 2025 Report Details Continued Physical Abuse by Staff at Mid-State ........................36

WilmerHale's Report Details Excessive Force by "Goon Squads" .............................................38

Defendants D'Amore, Hilton, and Martuscello Were Aware that Correction Officers Had Fatally Beaten Robert Brooks Only Three Months Earlier ..........................................................40

Defendants D'Amore, Hilton and Martuscello Failed to Implement DOCCS' Updated Body-Worn Camera (BWC) Policies ....................................................................................................43

Defendants D'Amore, Hilton and Martuscello Were Aware of and Deliberately Indifferent to the Risk of Harm Posed by CERT Officers ..................................................................................45

Supervisory Defendants Were Aware of and Deliberately Indifferent to the Heightened Risk of Harm to Incarcerated People Caused by the Wildcat Strikes .......................................................48

Defendants and the Mid-State CERT Unit Continue their Rampage of Unchecked Violence..49

i

FIRST CAUSE OF ACTION ........................................................................................................54

SECOND CAUSE OF ACTION ..................................................................................................55

THIRD CAUSE OF ACTION ......................................................................................................57

DAMAGES...................................................................................................................................59

PRAYER FOR RELIEF...............................................................................................................59

Plaintiff Rashad Abdul-Matin, by and through his Attorneys, Prisoners' Legal Services of New York, for his complaint alleges as follows:

## PRELIMINARY STATEMENT

1. This case concerns the brutal and unprovoked beating of Rashad Abdul-Matin by a gang of correctional staff at Mid-State Correctional Facility ("Mid-State") on February 27, 2025.

2. Correctional staff punched and kicked him well over a dozen times before having him strip naked before they continued beating him, including blows to his genitals.

3. This assault on Mr. Abdul-Matin was part of a barrage of violence perpetrated by the Correctional Emergency Response Team ("CERT") unit[1] at Mid-State that culminated in the murder of Messiah Nantwi on March 1, 2025.[2]

4. Indeed, many of the same individuals charged with criminal conduct and/or professional discipline because of Mr. Nantwi's death were personally involved in the assault of Mr. Abdul-Matin.

5. As they did with the death of Mr. Nantwi, here too did correctional staff conspire to cover up the assault of Mr. Abdul-Matin.

6. They were emboldened to do so by the culture of violence and impunity within the New York State Department of Corrections and Community Supervision ("DOCCS").

---

[1] The CERT unit is a group of correction officers that use paramilitary tactics to manage riots, transfer of high security individuals, and significant security events within DOCCS. *See generally* https://www.corrections1.com/cert; Kirkpatrick Decl. ¶¶ 5-8, *Matthews v. Cuomo*, 9:17-cv-00503-GTS-ML, (N.D.N.Y Aug. 28, 2018), ECF No. 122.

[2] *See generally* Wilmer Cutler Pickering Hale & Dorr LLP, *Report Concerning the N.Y. State Dep't of Corr. & Cmty. Supervision*, 12-24, 29-36 (June 29, 2026), https://doccs ny.gov/system/files/documents/2026/07/wilmerhale_-doccs-report_062926.pdf ("Following the killing of [Robert] Brooks and continuing after the killing of Mr. Nantwi, DOCCS retained Wilmer Cutler Pickering Hale and Dorr LLP . . . to conduct a review of DOCCS' patterns and practices regarding the use of force and an assessment of DOCCS' internal systems and procedures to identify any potential systemic issues.").

1

7. Responsibility for the harm caused extends well beyond the correctional staff who laid hands on Mr. Abdul-Matin; it includes staff who failed to intervene, and senior DOCCS officials who knew how rampant the brutality within the system was and failed to protect Mr. Abdul-Matin from it.

## JURISDICTION AND VENUE

8. This action seeks redress pursuant to 42 U.S.C. § 1983 for Defendants' violations of rights protected by the Eighth Amendment to the United States Constitution.

9. This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States.

10. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## JURY DEMAND

11. Plaintiff demands a trial by jury in this action.

## PARTIES

12. Plaintiff Rashad Abdul-Matin is a citizen of the United States and resided at Mid-State at the time these events occurred. He is no longer incarcerated.

13. At all times relevant to this Complaint, Defendants Joshua Bartlett, Shane Bower, Michael Gerhardt, Michael G. Jones, Jonah Levi, Steven Mack, Scott Monnat, Christopher Perri, and Brett Radley, were employed by DOCCS as correction officers at Mid-State. At all times relevant to this Complaint, Defendants Craig Klemick and Tristan

2

Sheppard were employed by DOCCS as correction officers at Marcy Correctional Facility ("Marcy").

14. At all times relevant to this Complaint, Defendants Francis Chandler, William Dundon, David Ferrone, and Ryan Russell, were employed by DOCCS as sergeants at Mid-State.

15. At all times relevant to this Complaint, Defendants John and Jane Does 1-20 were employees of DOCCS whose identities are currently unknown to Plaintiff but who participated in Mr. Abdul-Matin's assault and/or failed to intervene to stop it.

16. The Defendants listed in ¶ 13-15 will collectively be referred to as the "On-Scene Defendants."

17. At all times relevant to this Complaint, Defendant Michael D'Amore was the Deputy Commissioner for Correctional Facilities.

18. In this role, he oversees the CERT units at DOCCS facilities.

19. Prior to serving in this role, he was a Superintendent, First Deputy Superintendent, and Director of the Crisis Intervention Unit.

20. He began his DOCCS career in 1998 as a correction officer and worked his way up through the ranks to these various supervisory roles.

21. At all times relevant to this Complaint, Defendant Bryan Hilton was the Superintendent at Mid-State.

22. Prior to becoming Superintendent of Mid-State, Defendant Hilton served in other supervisory roles at DOCCS, including as an Assistant Commissioner for DOCCS.

23. In his role as Superintendent, Defendant Hilton was responsible for the safety and security of incarcerated individuals and staff and assumed responsibility for overseeing all aspects of day-to-day life at Mid-State.

3

24. In his role as Superintendent, Defendant Hilton set policies, customs, and practices at Mid-State and was responsible for monitoring Mid-State correction officers' compliance with those policies.

25. In his role as Superintendent, Defendant Hilton was responsible for reviewing reports of correction officers' use of force against incarcerated individuals and associated documentation to assess whether the correction officer complied with DOCCS directives.

26. In his role as Superintendent, Defendant Hilton was responsible for monitoring Mid-State correction officers to determine whether they posed a risk to incarcerated individuals' safety.

27. In his role as Superintendent, Defendant Hilton was responsible for taking action to ensure the safety and security of incarcerated individuals.

28. At all times relevant to this Complaint, Defendant Daniel F. Martuscello, III was the Commissioner of DOCCS.

29. Defendant Martuscello assumed oversight of DOCCS as Acting Commissioner on June 9, 2023, and formally became Commissioner of DOCCS on May 23, 2024.

30. In his role as Commissioner, Defendant Martuscello set policies, customs, and practices for DOCCS.

31. In his role as Commissioner, Defendant Martuscello was ultimately responsible for ensuring the safety of individuals in DOCCS custody.

32. Prior to becoming Commissioner, Defendant Martuscello had nearly three decades of experience working for DOCCS in various capacities. For six years prior to becoming Commissioner, Martuscello served as second-in-command to Acting Commissioner

4

Anthony Annucci. When Defendant Martuscello became Commissioner of DOCCS, he was widely recognized for his vast institutional knowledge of DOCCS.

33. At all times relevant to this Complaint, every Defendant named in the Complaint was acting within the scope of his employment and under color of state law.

## STATEMENT OF FACTS[3]

*The Attack on Rashad Abdul-Matin on February 27, 2025*

34. On Thursday, February 27, 2025, shortly after lunchtime, Mr. Abdul-Matin, a then-36-year-old man, was in the dayroom of the 4-H dorm at Mid-State.

35. Between approximately 11:40 a.m. and 12:30 p.m., Correction Officer Mykal Rasheed made a request for assistance, which was broadcast to correction staff throughout Mid-State.[4]

36. Earlier in the morning, the CERT team had come to the 4-H dorm and threatened the incarcerated individuals that if they had to return, they would "take people out."

37. Staff including, but not limited to, Sergeant Ryan Russell, Sergeant David Ferrone, Sergeant Cory Flack, Correction Officer Michael Gerhardt, Correction Officer Tristan Sheppard, Correction Officer Scott Monnat, Correction Officer Shane Bower, Correction Officer Michael Jones, Correction Officer Brett Radley, Correction Officer Christopher Perri, and Correction Officer Jonah Levi, responded to the 4-H dorm and entered the dayroom.

---

[3] All facts alleged herein are upon information and belief, and in part based on counsel's review of information in court documents, including the indictments issued in connection with Mr. Nantwi's death, as well as in news articles, publicly available investigative reports, PACER, NYSCEF, production of records in response to Freedom of Information Law requests, and other sources of publicly available information.
[4] The WilmerHale Report commissioned by DOCCS in the aftermath of the killings of Mr. Brooks and Mr. Nantwi references these events. *See* WilmerHale Report, *supra* note 2, at 32-33.

38. One or more of the On-Scene Defendants who were CERT members directed Mr. Abdul-Matin and the individuals in the dayroom to return to their rooms for the "count" of incarcerated people in the prison.

39. Mr. Abdul-Matin immediately returned to his room and stood next to his bed facing the wall.

40. Mr. Abdul-Matin then heard Officer Rasheed, accompanied by a group of the On-Scene Defendants who were CERT members, walk down the hall towards his room, and state "I don't know what his problem is, but him right there."

41. Mr. Abdul-Matin was then instructed by one or more of the On-Scene Defendants who were CERT members to put his hands behind his back.

42. He complied and then was handcuffed by one or more of the On-Scene Defendants who were CERT members.

43. One or more of the On-Scene Defendants who were CERT members escorted Mr. Abdul-Matin to the dayroom.

44. One or more of the On-Scene Defendants who were CERT members instructed Mr. Abdul-Matin to lie face down on the ground.

45. Mr. Abdul-Matin complied and remained cuffed behind his back.

46. Some of the On-Scene Defendants who were CERT members escorted four other incarcerated individuals into the dayroom and instructed them to lie down on the ground as well.

47. A few minutes later, one of the On-Scene Defendants who was a CERT member approached Mr. Abdul-Matin and picked him up from behind by grabbing his handcuffed arms and bringing him to a standing position.

48. That same individual along with another On-Scene Defendant, both of whom were CERT members, escorted Mr. Abdul-Matin out of the dayroom down a long hallway to a stairwell.

49. While they were walking down the stairs, the On-Scene Defendants pushed Mr. Abdul-Matin's face into the wall and/or failed to intervene as their colleagues pushed him, despite having a reasonable opportunity to do so.

50. This caused both Mr. Abdul-Matin's nose and forehead to hit the wall forcefully.

51. This knocked Mr. Abdul-Matin's glasses off his face, breaking them.

52. Mr. Abdul-Matin said "this is just one big misunderstanding," and one of the On-Scene Defendants replied, "Yeah right!"

53. They continued walking outside of the building where a van was waiting for them.

54. Another On-Scene Defendant was waiting for them in the driver's seat, and the three On-Scene Defendants and Mr. Abdul-Matin drove to the Special Housing Unit (SHU) building.

55. Upon arrival at the SHU building, the On-Scene Defendants who had escorted Mr. Abdul-Matin out of the dayroom then escorted him from the van and into the strip frisk room in the SHU building.

56. When they arrived in the strip/frisk room, Defendants Klemick, Chandler, and another On-Scene Defendant, all members of the CERT team, were waiting there.

57. Defendant Bartlett was at his desk in the strip-frisk room when they arrived.

58. Mr. Abdul-Matin was brought to the cell in the strip/frisk room and his handcuffs were removed.

7

59. One or more of the On-Scene Defendants instructed Mr. Abdul-Matin to face the back wall of the cell and place his hands on the wall, which he did.

60. Then, the cell door opened, and multiple On-Scene Defendants rushed into the cell.

61. These On-Scene Defendants began punching Mr. Abdul-Matin on both sides of his body and his head and/or failed to intervene as their colleagues punched him, despite having a reasonable opportunity to do so.

62. This included approximately six blows to Mr. Abdul-Matin's head from the sides of his cheeks to his upper temples and numerous blows to his body and specifically his ribs.

63. Mr. Abdul-Matin fell to the ground in pain and attempted to curl up in the fetal position to protect his face.

64. After he fell to the ground, the On-Scene Defendants started kicking Mr. Abdul-Matin's lower back and/or failed to intervene as their colleagues kicked him, despite having a reasonable opportunity to do so; they hit Mr. Abdul-Matin's back approximately eight times.

65. Tears began streaming down Mr. Abdul-Matin's face.

66. One of the On-Scene Defendants responded by saying, "the more you cry, the more we're going to keep going."

67. The blows stopped for a brief moment as one or more of the On-Scene Defendants told Mr. Abdul-Matin to stand and remove his clothing for a strip frisk.

68. Mr. Abdul-Matin stood up and began to remove his clothing.

69. As he undressed, the beating resumed, including punches to his upper forehead, which began to bleed.

8

70. Once all his clothing was removed, one or more On-Scene Defendants told Mr. Abdul-Matin to squat.

71. The On-Scene Defendants kicked Mr. Abdul-Matin's genitals and buttocks approximately four times and/or failed to intervene as their colleagues kicked him, despite having a reasonable opportunity to do so.

72. The pain of these kicks caused Mr. Abdul-Matin to fall to the ground once again.

73. One or more of the On-Scene Defendants instructed him to get dressed.

74. As Mr. Abdul-Matin attempted to put his clothing back on, the On-Scene Defendants punched him approximately four more times and/or failed to intervene as their colleagues punched him, despite having a reasonable opportunity to do so.

75. Once Mr. Abdul-Matin was dressed, Defendant Bartlett entered the strip frisk room and wiped the blood off Mr. Abdul-Matin's forehead.

76. Defendant Bartlett and three other On-Scene Defendants escorted Mr. Abdul-Matin to a cell in the SHU.

77. Defendant Bartlett threatened Mr. Abdul-Matin, telling him to behave or something would happen to him.

78. Approximately eight hours later, Defendants Dundon, Klemick, Chandler, and another On-Scene Defendant (the latter three of whom were CERT) escorted Mr. Abdul-Matin from his new cell in the SHU back to the strip frisk room where he had been assaulted.

79. Portions of this interaction were captured by Defendant Dundon's body-worn camera ("BWC").

80. Once in the strip frisk room, Defendant Dundon had Defendants Klemick, Chandler, and another On-Scene Defendant leave the room.

81. Defendant Dundon told Mr. Abdul-Matin that he had to interview him because another incarcerated individual had accused Mr. Abdul-Matin of misconduct.

82. Defendant Dundon then shut off his BWC.

83. When the BWC was turned back on, Defendants Klemick, Chandler, and two other On-Scene Defendants, as well as a nurse entered the strip frisk room; Defendant Dundon was still in the strip frisk room and Mr. Abdul-Matin was still in the cell in the strip frisk room.

84. One of the On-Scene Defendants told Mr. Abdul-Matin to undress to his boxers, which he did.

85. Defendant Dundon asked Mr. Abdul-Matin a series of questions about what occurred that day in the presence of Defendants Klemick, Chandler, and another On-Scene Defendant, all three of whom had earlier assaulted Mr. Abdul-Matin.

86. Out of fear for his safety, Mr. Abdul-Matin stated that he was not involved in any assault or fight and denied having any injuries.

87. Defendant Chandler took photos of Mr. Abdul-Matin through the cell door.

88. The nurse approached the cell and said Mr. Abdul-Matin did not have any injuries. She did not enter the cell to examine him.

89. The nurse also asked Mr. Abdul-Matin a handful of questions, while Defendants Dundon, Klemick, Chandler, and two other On-Scene-Defendants looked on and intermittently interrupted the nurse to repeat and rephrase her questions.

90. Defendants Chandler, Klemick, and one other On-Scene Defendant then escorted Mr. Abdul-Matin out of the strip frisk room.

91.    As he was leaving, Defendant Dundon told him that he would receive a ticket soon and to "respect these guys' houses!"

92.    Mr. Abdul-Matin remained in the SHU for fifteen days before being released.

93.    Sergeant C. Flack wrote a misbehavior report charging Mr. Abdul-Matin with threats, creating a disturbance, refusing a direct order, and interference with an employee, but it was never given to Mr. Abdul-Matin nor was a prison disciplinary hearing ever held related to the misbehavior report.[5]

94.    Immediately following the incident, Mr. Abdul-Matin experienced significant pain in his ribs that continued for weeks.

95.    The pain was so bad that it made it difficult to sleep.

96.    He also felt a clicking sensation in his ribs.

97.    Mr. Abdul-Matin put in three sick call requests on February 28, March 7, and March 10.

98.    Mr. Abdul-Matin did not see a primary care provider until March 19, 2025.

99.    The provider noted in his medical records, "When palpated at the 8th and 9th left rib level extreme tenderness noted, no discoloration or pain proximal to the spine, until the area around mid clavicula. A raised area pushing skin out was noted not to follow the general curvature but was stated 'It's been like that since 2-27.'"

100.    DOCCS's Office of Special Investigations ("OSI") investigated the incident in the 4H dorm that preceded Plaintiff's assault.

101.    The investigation concluded that Defendants Russell, Ferrone, Gerhardt, Sheppard, Monnat, Bower, Jones, Radley, and Perri, failed to report a use of force they were in

---

[5] *See generally* WilmerHale Report, *supra* note 2, at 33.

direct view of; specifically, they found that Defendant Jones denied witnessing a use of force during his questioning.

102. The investigation also concluded that Defendants Russell, Ferrone, and Perri did not have BWCs on their person nor activated while interacting with incarcerated individuals.

103. The investigation also concluded that Defendants Radley and Levi instructed Correction Officer Mack to turn off his BWC.

104. DOCCS's Bureau of Labor Relations ("BLR") issued a Notice of Discipline to Defendant Perri for failing to wear his BWC, noting that his failure to wear a BWC impeded DOCCS's investigation the incident.

105. DOCCS's BLR issued a Notice of Discipline to Defendant Jones for failing to report the inappropriate use of force and lying when asked about the use of force.

106. DOCCS's BLR is a Notice of Discipline to Defendant Radley for demanding/asking a co-worker to turn off their BWC, during a period when there were alleged to be multiple inappropriate uses of force.

*Defendants D'Amore, Hilton, and Martuscello are Responsible for the Assault on Mr. Abdul-Matin*

107. Defendants D'Amore, Hilton, and Martuscello are also liable for Mr. Abdul-Matin's assault because they were each personally aware of and deliberately indifferent to the substantial risk of serious harm that correction officers posed to incarcerated individuals at Mid-State, including Mr. Abdul-Matin.

108. All DOCCS facilities, and Mid-State in particular, under the supervision of Defendants D'Amore, Hilton, and Martuscello, have suffered from a longstanding pattern, practice,

and custom of excessive, and sometimes fatal, force by correction officers against incarcerated people.

109. This longstanding pattern, practice, and custom of excessive force by correction officers has fostered a culture of violence within DOCCS facilities, including at Mid-State, in which officers are allowed and emboldened to brutalize incarcerated individuals with impunity.

110. A critical component of this longstanding pattern, practice, and custom of excessive force is the accompanying strict code of silence, pursuant to which correction officers ignore or affirmatively cover up other officers' misconduct and abuse.

111. The actions of the On-Scene Defendants against Mr. Abdul-Matin are a direct and foreseeable result of this longstanding pattern, practice, and custom of excessive force and the resulting culture of violence within DOCCS facilities, including Mid-State.

112. Incidents of physical violence and abuse at DOCCS facilities followed by attempted cover-ups of such violence, including at Mid-State, have been thoroughly documented, publicized, and confirmed by federal and state prosecutors, criminal and civil juries, the news media, independent research organizations, internal complaints by incarcerated people at DOCCS facilities, and numerous civil rights lawsuits.

113. Defendants D'Amore, Hilton, and Martuscello were each personally aware of and deliberately indifferent to this dangerous pattern, practice, and custom of excessive force by correction officers and the substantial risk of serious harm it posed to incarcerated people in DOCCS facilities, such as Mr. Abdul-Matin.

114. At the time of the assault of Mr. Abdul-Matin, Defendants D'Amore, Hilton, and Martuscello were each personally responsible for ensuring the safety of incarcerated individuals at Mid-State.

115. Defendants D'Amore, Hilton, and Martuscello had the responsibility and authority to set policies, make rules, communicate expectations, issue disciplinary actions, and control the correction officers who worked at Mid-State.

116. Despite their responsibility and authority, Defendants D'Amore, Hilton, and Martuscello failed to enact and/or enforce policies that would have prevented attacks on incarcerated individuals like Mr. Abdul-Matin.

117. Despite their responsibility and authority, Defendants D'Amore, Hilton, and Martuscello took no meaningful action to mitigate the risk of serious harm posed by the pattern, practice, and custom of excessive force against incarcerated individuals like Mr. Abdul-Matin.

118. As a direct and proximate result of Defendants D'Amore, Hilton, and Martuscello's deliberate indifference to this pattern, practice, and custom of excessive force, the On-Scene Defendants brutally beat Mr. Abdul-Matin.

119. Long before Mr. Abdul-Matin was beaten at Mid-State, Defendants D'Amore, Hilton, and Martuscello knew that incarcerated individuals in DOCCS facilities, including at Mid-State, faced a substantial risk of serious harm at the hands of correction officers and took no meaningful action to address it, despite the many tools available to them to do so.

120. By virtue of the leadership roles Defendants D'Amore, Hilton, and Martuscello have each held within DOCCS, these Defendants have been personally informed, briefed on, and

updated about significant use of force incidents throughout DOCCS, including those described in this Complaint.

121. From 2012 to 2023, Defendant Martuscello was responsible for reviewing all Office of Special Investigation ("OSI") reports and deciding whether to issue Notices of Discipline for correctional staff who physically abused incarcerated individuals.

122. From 2012 to present, Defendant Martuscello has been personally informed of significant OSI investigations involving staff abuse and lawsuits involving abuse by correction officers, including many of the lawsuits detailed in this Complaint.

123. As Deputy Commissioner of Correctional Facilities, Defendant D'Amore oversees security operations for all DOCCS facilities, including CERT units.

124. In this capacity, he is personally informed of significant OSI investigations involving staff abuse and lawsuits involving abuse by correction officers.

125. In his prior role as Superintendent of Marcy Correctional Facility, Defendant D'Amore was responsible for reviewing reports of correction officer uses of force against incarcerated individuals and associated documentation to assess whether the correction officer complied with DOCCS directives.

126. As Superintendent at Mid-State, Defendant Hilton was responsible for reviewing reports of correction officer uses of force against incarcerated individuals and associated documentation to assess whether the correction officer complied with DOCCS directives.

127. As Superintendent at Mid-State, Defendant Hilton had a variety of tools available to him to evaluate whether a particular correction officer posed a risk to inmate safety, including reviewing inmate grievances, use of force reports, unusual incident reports, the officer's

15

human resources files, the officer's discipline documentation, and lawsuits filed against the officer.

128. As Superintendent at Mid-State, Defendant Hilton had a variety of tools available to him to reduce the risk of harm that correction officers posed to incarcerated individuals including counseling, monitoring, temporary reassignment, additional training, and meeting with the individual officer and/or their supervisor.

129. As Superintendent at Mid-State, Defendant Hilton could also initiate discipline of correction officers who physically abused an incarcerated individual through the procedures set forth in the Collective Bargaining Agreement.

130. As a Superintendent and former Assistant DOCCS Commissioner, Defendant Hilton was personally aware of significant use of force incidents at Mid-State and throughout DOCCS, including those described in this Complaint.

131. Defendants D'Amore, Hilton, and Martuscello failed to employ any of the tools available to them to minimize the serious risk of harm that correction officers specifically posed to incarcerated individuals at Mid-State.

<u>The Marshall Project</u> and <u>New York Times</u> Investigation Reports

132. From 2015 to 2016, *the Marshall Project* and *the New York Times* conducted an extensive investigation of DOCCS facilities to examine the use of force by corrections officers at prisons across New York State (the "MP/NYT Investigation").[6]

---

[6] Michael Winerip, Michael Schwirtz and Tom Robbins, *The State That is Taking on the Prison Guards Union*, The Marshall Project (Apr. 11, 2016), https://www.themarshallproject.org/2016/04/11/the-state-that-is-taking-on-the-prison-guards-union.

16

133. The MP/NYT Investigation concluded that a "culture of brutality has been allowed to thrive in the prisons, where a few rogue guards, often known on the cellblocks as beat-up squads, administer vigilante justice, while fellow officers look the other way."

134. The MP/NYT Investigation also noted that "[p]erhaps the biggest challenge for investigators is the culture of silence among guards."[7]

135. The findings of the MP/NYT Investigation were published in a series of New York Times articles, beginning in February 2015.

136. The New York Times articles documented numerous horrific instances of violence against incarcerated individuals across DOCCS facilities.

137. According to the MP/NYT Investigation, in 2010, Leonard Strickland, an incarcerated individual at Clinton Correctional Facility, was killed by a group of correction officers who viciously beat him and pushed him down a flight of stairs. The MP/NYT Investigation noted that this incident was consistent with "a troubling pattern of savage beatings by corrections officers at prisons across New York State and a department that rarely holds anyone accountable."[8]

138. According to the MP/NYT Investigation, in 2015, Samuel Harrell, an incarcerated individual at Fishkill Correctional Facility, was killed by the "Beat Up Squad", a group of officers notorious for committing gruesome and unjustified assaults on incarcerated people. Mr. Harrell was killed in a building at Fishkill that had been explicitly flagged to

---

[7] *Id.*; *see generally* WilmerHale Report, *supra* note 2, at 100-03.
[8] Michael Winerip & Michael Schwirtz, *An Inmate Dies, and No One Is Punished*, N.Y. Times (Dec. 13, 2015), https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html.

17

DOCCS officials as a "violent place," due to the unjustified abuse that routinely took place there.[9]

139.    The officers involved in Mr. Harrell's murder falsely claimed that Mr. Harrell had overdosed, even though Mr. Harrell's autopsy confirmed there were no illegal drugs in his system and his cause of death was ruled a homicide. Officers further falsely claimed that Mr. Harrell had assaulted them.[10]

140.    According to the MP/NYT Investigation, in 2011, George Williams, an incarcerated individual at Attica Correctional Facility, was brutally beaten by correction officers, resulting in a broken shoulder, several cracked ribs, two broken legs, a severe fracture of the orbit surrounding his left eye, a large amount of blood lodged in his left maxillary sinus, and multiple cuts and bruises. After nearly killing Mr. Williams, the officers engaged in an elaborate cover up, falsifying official reports and destroying evidence. The MP/NYT investigation emphasized that the assault on Mr. Williams offered "a vivid lesson in the intractable culture of prison brutality."[11]

141.    According to the MP/NYT Investigation, in 2014, Ramon Fabian, an incarcerated individual at Ulster Correctional Facility, was brutally assaulted by correction officer Michael Bukowski, who later denied any involvement in the attack and lied to investigators.[12]

---

[9] Michael Schwirtz & Michael Winerip, *Prison Guard 'Beatup Squad' is Blamed in New York Inmate's Death*, N.Y Times (Aug. 18, 2015), https://www.nytimes.com/2015/08/19/nyregion/fishkill-prison-inmate-died-after-fight-with-officers-records-show.html.

[10] *See Harrell v. N.Y. State Dep't of Corr. and Cmty. Supervision*, No. 15-cv-7065 (S.D.N.Y. Aug. 14, 2019), ECF No. 214.

[11] Tom Robbins, *A Brutal Beating Wakes Attica's Ghosts*, N.Y. Times (Feb. 28, 2015), https://www.nytimes.com/2015/03/01/nyregion/attica-prison-infamous-for-bloodshed-faces-a-reckoning-as-guards-go-on-trial.html.

[12] Tom Robbins, *Guarding the Prison Guards: New York State's Troubled Disciplinary System*, N.Y. Times (Sept. 27, 2015), https://www.nytimes.com/2015/09/28/nyregion/guarding-the-prison-guards-new-york-states-troubled-disciplinary-system.html.

18

142. The MP/NYT Investigation noted a troubling pattern of officer coverups, noting that "[c]ritics including the Correctional Association of New York, a nonprofit group that monitors the state's prisons, say the episodes show that [DOCCS] has often ignored brutality."[13]

143. According to the MP/NYT Investigation, in 2015, correction officers savagely assaulted dozens of incarcerated individuals at Clinton Correctional Facility, including beating incarcerated individuals while they were handcuffed, choking them, and slamming them against cell bars and walls. One notoriously violent officer at Clinton, commonly known as "Captain America," tied plastic bags around incarcerated individuals' necks and tightened them until the incarcerated individual passed out.[14]

144. The MP/NYT Investigation reported that between 2010 and 2015, New York State paid at least $8.8 million in settlements or jury awards in cases where correction officers were accused of prisoner abuse or excessive force. The MP/NYT Investigation noted that "[a]mong those 207 cases, the names of some officers and prisons crop up repeatedly."[15]

145. Defendant Martuscello was a DOCCS deputy commissioner at the time the MP/NYT Investigation was published and was interviewed in connection with the Investigation.

---

[13] *Id.*

[14] Michael Schwirtz & Michael Winerip, *Prison Inmates Put a Name to a Feared Guard Known as Captain America*, N.Y Times (Oct. 1, 2015), https://www.nytimes.com/2015/10/02/nyregion/prison-guard-known-as-captain-america-is-feared-on-upstate-cell-block.html.

[15] Tom Robbins, *New York State Prisons Take Steps to Track Complaints About Guards*, N.Y. Times (Dec. 20, 2015), https://www.nytimes.com/2015/12/21/nyregion/new-york-state-prisons-take-steps-to-track-complaints-about-guards.html.

146.    Defendant Martuscello posed for photos with a New York Times photographer and told reporters that he was ready to "do anything necessary" to fight the correction officers' union.[16]

147.    Defendant Martuscello was personally aware of the contents of the MP/NYT Investigation, including the numerous instances of physical abuse documented therein.

148.    Defendants D'Amore, Hilton, and Martuscello took no action to prevent correction officers at Mid-State from physically abusing incarcerated individuals in their custody despite their personal knowledge of the risks that correction officers posed to incarcerated individuals.

*Recent Jury Verdicts, Settlements, and Criminal Pleas Reveal Persistent Physical Violence and Abuse Across DOCCS Facilities*

149.    Recent jury verdicts, settlements, pleas, and judicial findings further reveal continued incidents of excessive force and abuse against incarcerated individuals and the culture of violence that persists across DOCCS facilities.

150.    In September 2016, a Lieutenant waterboarded and violently assaulted Matthew Raymond, an incarcerated individual at Auburn Correctional Facility, while he was shackled and defenseless, inflicting permanent injuries to Mr. Raymond's genitals and bladder. Auburn correction officers and a sergeant stood by and did nothing to stop the attack. The officers ultimately settled the claims for $1.2 million.[17]

151.    In November 2023, a federal jury awarded the family of Terry Cooper $9.25 million in connection with his fatal beating by Clinton correction officers, who beat Cooper so

---

[16] Michael Winerip, Michael Schwirtz & Tom Robbins, *The State That is Taking on the Prison Guards Union,* The Marshall Project (Apr. 11, 2016), https://www.themarshallproject.org/2016/04/11/the-state-that-is-taking-on-the-prison-guards-union.
[17] *See Raymond v. Mitchell*, No. 18-cv-1467 (N.D.N.Y., Mar. 1, 2019), ECF Nos. 20, 201.

20

severely that it caused a fatal asthma attack, deprived him of his asthma pump, and then covered up the attack and denied the use of force.[18]

152.   In 2021 and 2022, DOCCS settled three separate federal lawsuits in connection with assaults of incarcerated individuals by correction officers at Green Haven Correctional Facility. One suit involved the brutal assault of Carlos Garcia by six officers who put him into a chokehold until he lost consciousness and then slammed his head against a wall.[19]

153.   The second suit involved three separate assaults on Benjamin Stephens by nine officers who choked him and smashed his head so hard that he had a seizure.[20]

154.   The third suit involved an assault of Nakia Rose by five officers who, at a sergeant's direction, handcuffed Mr. Rose, brought him to the floor, kicked and punched him and twisted his ankles.[21]

155.   In July 2022, Aaron Finn, a correction officer at Green Haven, pled guilty to violating 18 U.S.C. § 242 in connection with the brutal beating of Melvin Virgil.[22]

156.   Officer Finn handcuffed Mr. Virgil and repeatedly smashed his head into a wall and steel bars as other officers silently watched. Multiple officers fabricated reports of misconduct against Mr. Virgil.[23]

157.   In April 2021, three correction officers at Fishkill Correctional Facility attacked Nicholas Magalios, holding him down and brutally kicking and punching him while other officers looked on and did nothing to intervene.[24] Mr. Magalios suffered significant bruising,

---

[18] *See Cooper v. Clancy*, Case No. 9:19-cv-00362 (N.D.N.Y. Nov. 23, 2023), ECF Nos. 52, 226.
[19] *See Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y Feb. 7. 2022), ECF No. 101.
[20] *See Stephens v. Venetozzi*, No. 13-cv-5779 (S.D.N.Y. Feb. 7, 2022), ECF. No. 381.
[21] *See Rose v. Garritt*, No. 16-cv-3624 (S.D.N.Y. July 30, 2021), ECF No. 128.
[22] *United States v. Finn*, No. 7:21-cr-00650-NSR (S.D.N.Y Oct. 26, 2022), ECF No. 28.
[23] *See Virgil v. Finn*, No. 22-cv-3169 (S.D.N.Y. Mar. 24, 2023), ECF No. 74.
[24] *Magalios v. Peralta*, No. 19-CV-6188 (CS), 2022 WL 407403, at *3 (S.D.N.Y. Feb. 10, 2022), *aff'd*, No. 22-519-PR, 2023 WL 4618349 (2d Cir. July 19, 2023).

marks, abrasions, lacerations and aggravation of a pre-existing shoulder injury, which required surgery.[25] The officers involved were found to have created false reports and given false testimony, denying the use of any force against Mr. Magalios.[26] A jury awarded Mr. Magalios $1 million dollars.[27]

158.   The Court stated that the officers' "conduct seems to be all too acceptable among certain employees of New York's prison system" and that "similar acts often go undetected in correctional facilities."[28]

159.   In May 2020, correction officers at Sullivan Correctional Facility settled excessive force claims against them for $5 million dollars in connection with the fatal assault of Karl Taylor.[29]

160.   In February 2020, a jury awarded Jerome Anderson $650,000 after finding a sergeant and three officers at Green Haven liable for excessive force.[30]

161.   The officers coordinated an attack on Mr. Anderson by taking him to an area lacking surveillance where they punched, stomped, and kicked him for several minutes.

162.   In 2013, correction officers at Downstate Correctional Facility brutally beat Kevin Moore, breaking his ribs and facial bones and ripping one of his dreadlocks out of his head.

163.   As a result of the beating, Mr. Moore was hospitalized for 17 days.

---

[25] *Id.*

[26] *Id.* at *4.

[27] *Id.* at *1.

[28] *Id.* at n.7, *6.

[29] *See Ramsay-Nobles v. Keyser*, No. 16-cv-5778 (S.D.N.Y. May 5, 2020), ECF No. 429.

[30] *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Feb. 24, 2020), ECF Nos. 133, 161.

164. On September 21, 2016, then United States Attorney Preet Bharara announced federal charges against five of the officers involved in the attack on Moore, including separate charges related to the use of excessive force and filing of false reports.[31]

165. Mr. Bharara noted that "excessive use of force in prisons . . . has reached crisis proportions in New York State."[32]

166. All five of the officers involved in Mr. Moore's beating were criminally convicted.

167. Since approximately 2017, Defendant Martuscello was made personally aware of significant legal cases like these, including settlements and jury verdicts involving allegations of excessive force by DOCCS staff as well as criminal charges brought against correction officers involving excessive force and cover-ups.

168. Several times per week, CANY also directly notifies DOCCS and other state agencies about allegations of abuse, maltreatment, neglect, or violations carried out by staff in New York's prisons.[33]

*A Second <u>Marshall Project</u> and <u>New York Times</u> Investigation Reports Pervasive Pattern of Coverups Across DOCCS Facilities*

169. In 2023, *the Marshall Project* and *the New York Times* conducted another investigation of DOCCS facilities, focused on an analysis of five thousand six hundred DOCCS

---

[31] Press Release, *Five Correction Officers Charged With Federal Crimes In Beating Of Inmate At Downstate Correctional Facility And Cover-Up*, U.S. DEP'T OF JUST. (Sept. 21, 2016), https://www.justice.gov/usao-sdny/pr/five-correction-officers-charged-federal-crimes-beating-inmate-downstate-correctional.

[32] Michael Winerip & Michael Schwirtz, *Five New York Prison Guards Charged in '13 Beating of Inmate*, N.Y. Times (Sept. 21, 2016), https://www.nytimes.com/2016/09/22/nyregion/new-york-officers-downstate-correctional-facility-inmate-beating.html.

[33] *CANY Statement on the Death of Robert Brooks at Marcy Correctional Facility*, CANY (Dec. 23, 2024), https://www.correctionalassociation.org/press-releases-archive/statement-on-death-of-robert-brooks-at-marcy.

disciplinary records dating back to 2010 (the "MP/NYT Disciplinary Record Investigation").[34]

170. The MP/NYT Disciplinary Record Investigation concluded that staff cover-ups of excessive force incidents are commonplace across DOCCS facilities.

171. The records revealed that correction officers typically "work in groups to conceal violent assaults by lying to investigators and on official reports, and then they file charges against their victims and have them sent to solitary."[35]

172. Defendant Martuscello was interviewed in connection with the 2023 MP/NYT Disciplinary Record Investigation.

173. Defendant Martuscello stated that he was not surprised that false reports often accompany instances of excessive force, noting that "[t]here has to be some manipulation of facts."[36]

174. Consistent with its general practice, prior to publishing the MP/NYT Investigation, the Marshall Project sent a "findings letter" to DOCCS, outlining the findings of its investigation.

175. Accordingly, Defendant Martuscello was personally aware of the contents of the MP/NYT Disciplinary Record Investigation, including the numerous instances of staff cover-ups documented therein.

---

[34] Alysia Santo, Joseph Neff & Tom Meagher, *Guards Brutally Beat Prisoners and Lied About it. They Weren't Fired*, N.Y. Times (May 25, 2023), https://www.nytimes.com/2023/05/19/nyregion/ny-prison-guards-brutality-fired html; Alysia Santo & Joseph Neff, *We Spent Two Years Investigating Abuse by Prison Guards in New York. Here are Five Takeaways,* The Marshall Project (May 22, 2023), https://www.themarshallproject.org/2023/05/22/new-york-prison-corrections-officer-discipline-findings.

[35] Alysia Santo & Joseph Neff, *We Spent Two Years Investigating Abuse by Prison Guards in New York. Here are Five Takeaways*, The Marshall Project (May 22, 2023), https://www.themarshallproject.org/2023/05/22/new-york-prison-corrections-officer-discipline-findings.

[36] Joseph Neff, Alysia Santo & Tom Meagher, *How a 'Blue Wall' Inside New York State Prisons Protects Abusive Guards*, The Marshall Project (May 22, 2023), https://www.themarshallproject.org/2023/05/22/new-york-prison-corrections-officer-abuse-cover-up.

176. Defendant Martuscello was familiar with all the news reports described in this Complaint, including the MP/NYT Investigative reports discussed herein.

177. As a member of the DOCCS Executive Team, Defendant Martuscello was provided with news clips containing information about DOCCS, that would contain articles like the ones described in this Complaint.

178. In 2023, Defendant D'Amore became Superintendent of Marcy Correctional Facility, and thus was familiar with all the news reports described in this Complaint, including the Marshall Project/New York Times Investigative reports discussed herein.

179. As the Superintendent of Mid-State and former Assistant Commissioner, Defendant Hilton was also familiar with all the news reports described in this Complaint, including the Marshall Project/New York Times Investigative reports discussed herein.

180. Defendants Martuscello, D'Amore and Hilton took no action to prevent correction officers from covering up excessive force incidents in this precise manner. As a result, correction officers at all DOCCS facilities, including at Mid-State, are emboldened to conceal their unlawful conduct by filing false reports.

*Prisoners' Rights Advocates Warned Defendant Martuscello of the Risk of Violence Against Incarcerated Individuals*

181. Since at least 2022, New York state prisoners' rights advocates have held quarterly conference calls with Defendant Martuscello to discuss issues pertaining to DOCCS.[37]

---

[37] JB Nicholas, *NY Prison Chief Ignored 'Ticking Time-Bomb' 3 ½ Months Before Guards Killed Robert Brooks*, The Free Lance News (Feb. 10, 2025), https://www.thefreelancenews.org/home/ny-prison-chief-ignored-ticking-time-bomb-3-12-months-before-guards-killed-robert-brooks.

182. On every quarterly conference call with Defendant Martuscello since approximately 2022, advocates have voiced their concerns about the continual assaults and beatings of incarcerated individuals in DOCCS facilities.

183. During one of these conference calls in early 2024, Tyrell Muhammad, a Senior Advocate at the Alliance of Families for Justice, explicitly warned Defendant Martuscello that the spiraling violence by correction officers was a "ticking time-bomb" and would soon result in an incarcerated individual's death.[38]

184. Defendant Martuscello dismissed these concerns.

185. On August 27, 2024, prisoners' rights advocates met face-to-face with Defendant Martuscello again to discuss the rampant abuse of incarcerated individuals.

186. Defendant Martuscello dismissed advocates' warnings and pleas to address the culture of abuse and downplayed the violence by staff.

187. In dismissing advocates' concerns, Defendant Martuscello stated that there were "too many cameras inside the prisons" for staff abuse to occur.[39]

188. Three-and-a-half months later, Robert Brooks was tortured and killed by correction officers at Marcy, on video.

189. Less than three months after Mr. Brooks was killed, Mr. Abdul-Matin was assaulted.

190. Defendant Martuscello was personally informed of the serious risk of harm to individuals like Mr. Brooks and Mr. Abdul-Matin only months before each were assaulted by DOCCS staff.

---

[38] *Id.*
[39] *Id.*

191. Notwithstanding this knowledge, Defendant Martuscello was deliberately indifferent to the risk of serious harm to incarcerated individuals at Mid-State, like Mr. Abdul-Matin, and took no meaningful action to mitigate the risk.

*Defendants D'Amore, Hilton, and Martuscello Were Aware of and Deliberately Indifferent to Decades of Rampant Violence by Correction Officers at Mid-State*

192. Even before Mr. Abdul-Matin was assaulted by the On-Scene Defendants, Defendants D'Amore, Hilton, and Martuscello were personally aware of the serious risk of harm that correction officers specifically posed to incarcerated individuals at Mid-State.

193. For decades, the rampant and unchecked abuse of incarcerated individuals at Mid-State has been thoroughly documented and publicized through the news media, independent research organizations, internal complaints by individuals incarcerated at Mid-State, and numerous civil rights lawsuits.

194. It is this culture of violence and brutality at Mid-State—and across all DOCCS facilities—that allowed the beating of Mr. Abdul-Matin to occur.

195. Defendants D'Amore, Hilton, and Martuscello were aware of the pattern, practice, and custom of the use of excessive force against incarcerated people and their associated cover-ups and, despite their knowledge and power as key policymakers at DOCCS in the case of Defendants Martuscello and D'Amore and Mid-State in the case of Defendant Hilton, they failed to enact and enforce policies that would have prevented such attacks, including the beating of Mr. Abdul-Matin.

196. Defendants D'Amore, Hilton, and Martuscello were also on notice of the massive number of instances of excessive force and cover-ups that were taking place at Mid-State, and that were a constant part of the facility's culture, custom, and practice.

27

197. Defendants D'Amore, Hilton, and Martuscello had a variety of tools available to them to reduce the risk of harm that Mid-State correction officers posed to incarcerated individuals including counseling, monitoring, temporary reassignment, additional training, pursuing discipline, and meeting with the individual officer and/or their supervisor to discuss the use of force.

198. Defendants D'Amore, Hilton, and Martuscello took no action to prevent correction officers at Mid-State from physically abusing incarcerated individuals in their custody.

*Thirty Correction Officers Conduct a Violent Raid at Mid-State in 2016*

199. In July 2016, approximately thirty correction officers conducted an extensive and violent raid of the 4H Housing Unit at Mid-State.[40]

200. The purpose of the raid was purportedly to locate a weapon that officers believed had been used by incarcerated individuals to assault a correction officer three days earlier and to send a message to the incarcerated individuals that further assaults would not be tolerated.[41]

201. Supervisory staff, including then-Superintendent Joseph Ward, condoned and oversaw the violent raid and use of excessive force by correction officers.[42]

202. Then-Superintendent Joseph Ward and the Deputy Superintendent of Security instructed officers to "make it clear to the 4H residents 'you don't touch staff.'"[43]

203. Officers and supervisors savagely assaulted twenty-eight incarcerated individuals at Mid-State, "indiscriminately kicking, punching, stomping, or slamming them."[44]

---

[40] *Aliaga v. State of New York*, 84 Misc.3d 1246(A) (2024).
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

28

204. During the raid, correction officers also sexually assaulted three incarcerated individuals, including inserting objects into two incarcerated individuals' rectums.[45]

205. Supervisors, including then-Superintendent Ward and other senior staff, were present at various points during the raid, "observing the damage to the dorm and appearing pleased with the result."[46]

206. On December 2, 2024, following a lengthy trial on liability in the New York Court of Claims, the court held that there was "no justification for the excessive and unreasonable use of force" against these incarcerated individuals on July 6, 2016.[47]

207. The Court further held that this raid had been "condoned by the highest levels of prison administration."[48]

208. Following the raid, OSI investigated, resulting in disciplinary actions against several officers and supervisors.

209. The then-Deputy Superintendent of Security at Mid-State was disciplined because he was "the high-ranking supervisor [and] he should have made sure that things were done differently."[49]

210. Then-Superintendent Ward was never disciplined for the raid because he resigned.[50]

211. Defendants D'Amore, Hilton, and Martuscello were aware of the 2016 raid, the ensuing OSI investigation, and the Court of Claims' December 2024 finding that over thirty Mid-State correction officers had used excessive force against incarcerated individuals and

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

29

accordingly posed a continued serious risk of harm against current incarcerated individuals at Mid-State.

212. Defendants D'Amore, Hilton, and Martuscello took no action following the Court of Claims' December 2024 finding to ensure that correction officers at Mid-State never engaged in the same type of physical violence or abuse again.

213. Defendants D'Amore, Hilton, and Martuscello failed to ensure installation of video cameras in the 4H housing unit.

*CANY's 2023 Monitoring Report Details Widespread Physical Abuse by Staff at Mid-State*

214. In October 2022, CANY conducted a comprehensive monitoring visit to Mid-State, which included meetings with prison staff and one hundred twenty-two interviews with incarcerated individuals.[51]

215. On July 5, 2023, CANY issued a report documenting its findings and conclusions stemming from its monitoring visit.

216. The CANY report recorded incidents of "routine – and sometimes racialized – abuse by staff, including physical assaults, and observations of a retaliatory environment."[52]

217. The CANY report also noted that the "most prominent open-ended finding for people in the general population [at Mid-State] was that of violence and abuse by security staff" and that "physical abuse was regular and expected" at Mid-State.[53]

---

[51] *New Report: Staff Abuses Surfaced in Correctional Association's Monitoring Visits to Central NY Prison,* Correctional Ass'n of N.Y., https://www.correctionalassociation.org/pressreleases-archive/2023-midstate-pvb-release.

[52] *Post-Visit Briefing & Recommendations No. 22-11: Monitoring Visit to Mid-State Correctional Facility - October 13-14, 2022,* Correctional Ass'n of N.Y., https://www.correctionalassociation.org/postvisit-briefing-recommendations/2023-11-midstate.

[53] *Id.*

218. According to the CANY report, one incarcerated individual described the environment: "You are at the whims of the guards. They can aggressively search you, beat you up and ignore you when you try to get their attention."[54]

219. According to CANY's report, incarcerated individuals "reported physical assaults, threats, and treatment by staff, in addition to day-to-day experiences of poor treatment and dehumanization in interactions. People described their interactions with staff as demeaning and fearful."[55]

220. CANY's report of rampant physical abuse by corrections officers at Mid-State was by no means an anomaly for DOCCS facilities.

221. CANY Executive Director Jennifer Scaife noted that CANY's "monitoring at Mid-State Correctional Facility highlighted troubling issues we have documented in many of the state's prisons."[56]

222. CANY's report also highlighted Mid-State's failure to require its correction officers to wear BWCs.

223. CANY reported that although "Mid-State had a supply of 250 body cameras," the facility "only used 30 at a time, and only issued them to sergeants."[57]

224. According to the CANY report, Mid-State was scheduled for installation of between 1,500 to 1,700 stationary cameras, but, for inexplicable reasons, the date of installation was unknown.[58]

---

[54] *Id.*
[55] *Id.*
[56] *New Report: Staff Abuses Surfaced in Correctional Association's Monitoring Visits to Central NY Prison,* Correctional Ass'n of N.Y., https://www.correctionalassociation.org/pressreleases-archive/2023-midstate-pvb-release.
[57] *Post-Visit Briefing & Recommendations No. 22-11: Monitoring Visit to Mid-State Correctional Facility - October 13-14, 2022,* Correctional Ass'n of N.Y., https://www.correctionalassociation.org/postvisit-briefing-recommendations/2023-11-midstate.
[58] *Id.*

225. CANY's report included a list of recommendations to DOCCS, stemming from their investigation and visit to Mid-State.

226. One of CANY's primary recommendations was that "DOCCS should investigate and address the reports of abuse of incarcerated people by staff."[59]

227. Defendants D'Amore, Hilton, and Martuscello were aware of the contents of CANY's July 2023 report regarding conditions at Mid-State and the recommendations included therein, including the reports of physical violence by staff.

228. Following a visit to a DOCCS facility, it is CANY's standard practice to provide a summary of its findings, concerns, and impressions to the facility's superintendent and the DOCCS Commissioner via email.

229. Following the monitoring visit to Mid-State in October 2022, CANY provided this summary about its findings, concerns and impressions via email to the Mid-State Superintendent and DOCCS Commissioner.

230. In July 2023, pursuant to standard practice, CANY provided its final published report to the acting DOCCS Commissioner, Defendant Martuscello.

231. As acting DOCCS Commissioner in July 2023, Defendant Martuscello was expected to review CANY's July 2023 report and take appropriate steps to protect the safety of incarcerated individuals in Mid-State.

232. As Superintendent of Mid-State, Defendant Hilton was expected to review CANY's July 2023 report and take appropriate steps to protect the safety of incarcerated individuals at Mid-State.

---

[59] *Id.*

32

233. Following CANY's July 2023 report, Defendants D'Amore, Hilton, and Martuscello took no steps to address or prevent continued staff violence against incarcerated individuals at Mid-State.

*Correction Officers Brutally Beat James Barton at Mid-State in 2023*

234. The 2023 attack on James Barton, an incarcerated individual at Mid-State, corroborated CANY's findings about Mid-State and reflects the longstanding pattern, practice, and custom of excessive force by correction officers against incarcerated individuals at Mid-State.

235. On April 13, 2023, Mid-State correction officers Rohail Khan, Brandon Montanari, and trainee Michael Williams, among others, brutally beat Mr. Barton.[60]

236. The attack on Mr. Barton was unprovoked and wholly unjustified.

237. The officers woke Mr. Barton up shortly after midnight, took him to a hallway outside his unit, and ordered him to hold his identification card against the wall.[61]

238. Officers proceeded to punch and kick Mr. Barton in his head, face, eyes, chest, back, stomach, legs, buttocks, and groin for approximately ten minutes until he fell to the floor.[62]

239. During the assault, one of the officers yelled "Let's give him the George Floyd challenge." Officers proceeded to put Mr. Barton in a chokehold while other officers beat him and kicked him.[63]

---

[60] *See* Brendan J. Lyons, '*Give him the George Floyd challenge': Officers Admit Beating Inmate*, Times Union (Apr. 24, 2025), https://www.timesunion.com/capitol/article/three-correction-officer-admitbeating-black-20292083.php; Gary Craig, *NY Prison Officers Allegedly Beat, Choked Inmate in a 'George Floyd Challenge'*, The Democrat & Chronicle (Jan. 7, 2025), https://www.democratandchronicle.com/story/news/2025/01/07/james-barton-beaten-by-two-officers-atmid-state-correctional-facility-new-york-lawsuit-alleges/77427432007/.

[61] *Id.*

[62] *Id.*

[63] *Id.*

240. The officers then agreed to lie about their use of force and to deny involvement or knowledge of the incident to investigators.

241. In October 2024, Officers Khan and Williams pled guilty to deprivation of rights under color of law in violation of 18 U.S.C. § 242 for the brutal beating of Mr. Barton.[64]

242. In connection with Mr. Barton's beating, DOCCS officials made a statement via email, indicating that "[d]iscipline has been initiated with some staff terminated already and two people have been convicted of federal crimes so far."[65]

243. DOCCS officials also stated that the agency helped federal prosecutors build their case against the officers.

244. Defendants D'Amore, Hilton, and Martuscello were personally aware of Mr. Barton's beating by Mid-State correction officers in April 2023.

245. Considering Mr. Barton's beating, which was in no way an aberration, Defendants D'Amore, Hilton, and Martuscello were personally aware of the substantial risk of serious harm that correction officers posed to other incarcerated people at Mid-State.

246. Between the date of Mr. Barton's assault and Mr. Abdul-Matin's assault, Defendants D'Amore, Hilton, and Martuscello took no meaningful action to prevent Mr. Abdul-Matin from facing a similar brutal attack by Mid-State correction officers.

*Defendants Levi, Gerhardt, and Jones Assault Shayzon Taylor at Mid-State in 2023*

247. The attack on Shayzon Taylor, another incarcerated individual at Mid-State, in September 2023 corroborates CANY's findings about Mid-State and reflects the

---

[64] *See United States v. Khan*, No. 5:24-CR-391 (N.D.N.Y. Oct. 29, 2024), ECF No. 4; *United States v. Williams*, No. 5:24-cr-00323 (N.D.N.Y. Oct. 23, 2024), ECF No. 5.

[65] Gary Craig, *NY Prison Officers Allegedly Beat, Choked Inmate in a 'George Floyd Challenge',* The Democrat & Chronicle (Jan. 7, 2025), https://www.democratandchronicle.com/story/news/2025/01/07/james-barton-beaten-by-two-officers-atmid-state-correctional-facility-new-york-lawsuit-alleges/77427432007/.

longstanding pattern, practice, and custom of excessive force by corrections officers against incarcerated people at Mid-State.

248.    In September 2023—only five months after Mr. Barton's beating—Defendants Levi, Gerhardt, Jones, and another correction officer brutally beat Mr. Taylor.[66]

249.    As a result of his beating, Mr. Taylor was taken to the hospital and treated for severe injuries.

250.    DOCCS OSI investigated this incident and concluded that Defendants Levi, Jones, and Gerhardt, as well as the other correction officer, used excessive force.[67]

251.    OSI also concluded that Defendant Hilton falsely testified that he had reviewed BWC footage, falsely testified that he counseled involved supervisory staff, authorized signing off that the use of force was reasonable despite evidence to the contrary, and failed to report the staff misconduct to OSI.[68]

252.    In May 2024, Defendants Levi, Gerhardt, and Jones, were put on twelve-month disciplinary evaluations, lasting through May 2025, for the use of excessive physical force against Mr. Taylor.[69]

253.    Accordingly, Defendants Levi, Gerhardt, and Jones were still in their disciplinary periods stemming from the beating of Mr. Taylor when they assaulted Mr. Abdul-Matin.

254.    Defendants D'Amore, Hilton, and Martuscello were aware of Mr. Taylor's beating by Mid-State correction officers in 2023.

---

[66] Kumi Tucker, *Amsterdam Woman: CO Charged with Murder Also Beat Her Husband*, WNYT (May 5, 2025), https://wnyt.com/top-stories/amsterdam-woman-co-charged-with-murder-also-beat-her-husband/.
[67] *Taylor v. Flack*, No. 9:26-cv-00375 (N.D.N.Y. March 10, 2026), ECF No. 1, ¶ 21.
[68] WilmerHale Report at 32.
[69] *Id.* WilmerHale Report at 31.

255. Defendants Hilton and Martuscello were aware of and involved in the decision to place Defendants Levi, Gerhardt, and Jones on twelve-month disciplinary evaluations in May 2024.

256. Notwithstanding that Defendants Levi, Gerhardt, and Jones were placed on twelve-month disciplinary evaluations, Defendants D'Amore, Hilton, and Martuscello failed to take any further steps to ensure that they did not pose a risk of harm to incarcerated individuals at Mid-State, including observing and monitoring their treatment of incarcerated individuals, meeting with them to discuss their uses of force, providing them with mentoring, counseling, or additional training, or evaluating their fitness for duty.

257. They also failed to exclude them from the CERT unit.

258. Considering Mr. Taylor's beating, Defendants D'Amore, Hilton, and Martuscello were also aware of and deliberately indifferent to the substantial risk of serious harm that Defendants Levi, Gerhardt, and Jones posed to incarcerated individuals at Mid-State.

259. Between the date of Mr. Taylor's assault and Mr. Abdul-Matin's beating, Defendants D'Amore, Hilton, and Martuscello took no meaningful action to prevent Mr. Abdul-Matin from facing a similar brutal attack by Mid-State correction officers, including Defendants Levi. Gerhardt, and Jones.

*CANY's 2025 Report Details Continued Physical Abuse by Staff at Mid-State*

260. On January 27, 2025—only *thirty-one days* before Mr. Abdul-Matin was assaulted — CANY conducted a second monitoring visit to Mid-State. This visit came a month after correction officers had murdered Robert Brooks at Marcy Correctional Facility, just across the street.

261.    Following its visit, CANY reiterated its "serious concerns about operational failures at Mid-State" to DOCCS officials.[70]

262.    CANY reported that conditions at Mid-State had deteriorated considerably since its monitoring visit in October 2022.[71]

263.    According to CANY's statement, the project to install 1,500 to 1,700 fixed surveillance cameras throughout the Mid-State facility had not advanced *at all* in the more than two years since its initial visit in 2022.[72]

264.    During CANY's January 2025 inspection of Mid-State, Defendant Hilton reported that although nearly 300 BWCs had been in use since May 2024, some were broken, and others were not remaining charged for the duration of a shift.

265.    CANY reported that incarcerated individuals at Mid-State continued to recount "specific incidents of violence and abuse by correctional officers."[73]

266.    CANY reported that incarcerated individuals at Mid-State described a "general lack of accountability throughout the facility, resulting in fundamental breakdowns in trust and the functioning of essential services, including medical care."[74]

267.    CANY noted that Mid-State was "not well-equipped to manage" its "large population of individuals with complex needs."[75]

268.    Defendants D'Amore, Hilton, and Martuscello were personally aware of the contents of CANY's statement detailing its concerns about Mid-State in January 2025.

---

[70] *CANY Statement in Response to Death of Incarcerated Individual at Mid-State Correctional Facility*, Correctional Ass'n of N.Y. (March 4, 2025), https://www.correctionalassociation.org/press-releases-archive/correctional-association-of-new-york-cany-statement-in-response-to-death-of-incarcerated-individual-at-mid-state-correctional-facility.
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*

269. Consistent with CANY's standard practice, on January 27, 2025, CANY reported its findings and concerns about Mid-State directly to Defendant Martuscello via email.

270. As DOCCS Commissioner, Defendant Martuscello was expected to read CANY's email detailing its concerns about Mid-State and take appropriate steps to protect the safety of incarcerated individuals at Mid-State.

271. As DOCCS Commissioner, Defendant Martuscello was expected to share CANY's concerns about Mid-State with DOCCS senior officials at Mid-State, including Defendant Hilton

272. As Deputy Commissioner for Correctional Facilities, complaints about the culture of staff violence would be a particular focus of Defendant D'Amore and thus he would be expected to review the report and work with Defendant Hilton to address these concerns.

273. As Superintendent of Mid-State, Defendant Hilton was expected to review CANY's concerns about Mid-State and take appropriate steps to protect the safety of incarcerated individuals at Mid-State.

274. Following CANY's January 2025 statement, Defendants Martuscello and Hilton took no steps to meaningfully address or prevent continued staff violence against incarcerated individuals at Mid-State.

*WilmerHale's Report Details Excessive Force by "Goon Squads"*

275. "Following the killing of [Robert] Brooks and continuing after the killing of Mr. Nantwi, DOCCS retained Wilmer Cutler Pickering Hale and Dorr LLP . . . to conduct a review of DOCCS' patterns and practices regarding the use of force and an assessment of DOCCS' internal systems and procedures to identify any potential systemic issues."[76]

---

[76] WilmerHale Report, *supra* note 2, at 1.

276.    As part of that review, WilmerHale "engaged a private investigation and litigation consulting firm to assist with interviews" ultimately speaking to forty-three current and former correction officers with experience at Marcy and Mid-State.[77]

277.    According to the report "[n]early all former officers interviewed acknowledged that Marcy and Mid-State had 'Goon Squads,' an informal group of correction officers who 'took things too far, used excessive force.'"[78]

278.    According to the report, some recently retired officers told WilmerHale's investigator(s) "that they knew certain officers involved in the killings of Mr. Brooks and Mr. Nantwi were a part of these squads."[79]

279.    Interviewees told WilmerHale's investigator(s) it was common knowledge that "Goon Squads" operated at Marcy and Mid-State.[80]

280.    "While some of the interviewed former officers wondered why 'bad apples,' who they believed were known to prison leadership, were not stopped . . . others suggested that they played the role of 'enforcers.'"[81]

281.    Defendant Martuscello told WilmerHale's investigator(s) that the approximately 2,000 officers terminated in response to the wildcat strike "included many who did not share in the Department's mission and policies, suggesting that problematic officers are *now* gone."[82]

---

[77] *Id.* at 40.
[78] *Id.* at 84.
[79] *Id.* at 85.
[80] *Id.* at 85.
[81] *Id.* at 85.
[82] *Id.* at 85 (emphasis added).

282. "Echoing this, one facility executive suggested [to WilmerHale's investigator(s)] that there are no 'bad apples' left at the facility, but in the same meeting also stated that 'we're realizing we have more bad apples than we thought.'"[83]

283. "In the same meeting, all present facility executives said that there remained problematic officers who had not been fired; one said that they sometimes report these officers, but nothing happens."[84]

284. At another facility visited by WilmerHale's investigator(s), "an executive opined that ten percent of the remaining correction officers were 'problem children' who 'may need more convincing' to change their ways."[85]

*Defendants D'Amore, Hilton, and Martuscello Were Aware that Correction Officers Had Fatally Beaten Robert Brooks Only Three Months Earlier*

285. On December 9, 2024, fourteen correction officers at Marcy sadistically beat Robert Brooks to death.[86]

286. Marcy Correctional Facility is directly across the street from Mid-State.

287. Mr. Brooks' savage beating was recorded on several of the correction officers' BWCs without their knowledge.

288. Over the course of ten minutes, at least six correction officers can be seen repeatedly punching, kicking, and attacking Mr. Brooks while he remains handcuffed, restrained, and utterly defenseless.[87]

---

[83] *Id.* at 85.
[84] *Id.* at 85-86.
[85] *Id.* at 86.
[86] *See Brooks v. Farina et al.*, No. 25-cv-0068 (N.D.N.Y. 2025).
[87] *Id.*

289. One officer can be seen lifting Mr. Brooks by the neck using a chokehold while other officers continued to beat him.[88]

290. Another officer is seen repeatedly hammering Mr. Brooks with the heel of a shoe.[89]

291. At least nine other officers can be seen standing by, watching Mr. Brooks get beaten to death.[90]

292. The officers standing by appear to be completely unfazed by the horror that they are witnessing.

293. Some officers even appear to be amused, visibly smiling, or laughing as Mr. Brooks is tortured to death.[91]

294. The recording of Mr. Brooks' murder provides a terrifying and up-close view of the dangerous reality that incarcerated individuals at DOCCS facilities face on a day-to-day basis.

295. The recording of Mr. Brooks' murder also confirms the pattern and practice of rampant abuse within DOCCS facilities that incarcerated individuals have reported and that CANY has documented and warned about for years.

296. Defendants D'Amore, Hilton, and Martuscello were aware that correction officers at Marcy had beaten Mr. Brooks to death on December 9, 2024.

297. On February 13, 2025, Defendant Martuscello issued a public statement that watching the video of Mr. Brooks' killing made him feel "deeply repulsed and nauseated."[92]

---

[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] Ed Shanahan, *Video Shows Prison Officers' Fatal Assault of Inmate in 'Shocking' Detail*, N.Y. Times (Dec. 27, 2024), https://www.nytimes.com/2024/12/27/nyregion/marcy-correctional-inmate-death-videony-prison.html.

298.   Defendant Martuscello acknowledged that there was "no excuse" for the officers' actions and recognized the need for "institutional change" to prevent similar incidents in the future.[93]

299.   But Defendant Martuscello was aware of the need for "institutional change" to address the culture of violence within DOCCS facilities long before Mr. Brooks was killed in December 2024.

300.   As alleged in this Complaint, numerous prisoners' rights advocates had personally warned Defendant Martuscello of this precise risk only three months before Mr. Brooks' death.

301.   Defendant Martuscello was personally aware, through internal complaints by incarcerated individuals, a multitude of civil rights lawsuits, reports by independent research organizations, the news media, and federal and state prosecutors, many of which are alleged in this Complaint, of numerous other incidents of violence by correction officers against incarcerated individuals in DOCCS facilities.

302.   Notwithstanding, Defendant Martuscello has been deliberately indifferent to the culture of violence and abuse by correction officers in DOCCS facilities and the resulting significant and ongoing risk of harm posed to incarcerated individuals.

303.   Following Mr. Brooks' murder, Defendant Martuscello pledged to prevent "this type of behavior" from recurring within DOCCS facilities and to investigate the entire department "to identify places where we can improve and make changes."[94]

---

[93] Erik Ortiz, *'Shocking' Bodycam Video Released of New York Officers Fatally Beating Prisoner*, NBC News (Dec. 27, 2024), https://www.nbcnews.com/news/us-news/shocking-bodycam-video-released-newyork-officers-fatally-beating-pris-rcna185537.

[94] Alecia Solorzano, *NYS AG releases bodycam footage amidst investigation into inmate death after encounter at Marcy Correctional Facility*, WENY News (Dec. 27, 2024), https://www.weny.com/story/52078963/nys-ag-releases-bodycam-footage-amidst-investigation-intoinmate-death-after-encounter-at-marcy-correctional-facility.

304.  But less than three months later, Mr. Abdul-Matin was beaten in a strikingly similar way less than one mile away.

*Defendants D'Amore, Hilton and Martuscello Failed to Implement DOCCS' Updated Body-Worn Camera (BWC) Policies*

305.  On February 11, 2025, in the wake of Mr. Brooks' death, DOCCS updated its policies to require DOCCS correction officers to wear and activate their provided BWCs during the duration of their shift (the "BWC Directive").[95]

306.  Upon information and belief, Defendant D'Amore signed the BWC Directive as the "Approving Authority."

307.  Pursuant to the BWC Directive, regardless of the presence of fixed cameras, correction officers who have been issued BWCs are required to manually activate them when "interacting with an incarcerated individual or visitor in any location," when "the employee observes unauthorized activity by an incarcerated individual, a DOCCS employee, or any other person in the facility," and when "the employee is responding to an emergency call for assistance (e.g., personal alarm activations, medical emergencies, disturbances in any area of the facility)."[96]

308.  Pursuant to the BWC Directive, BWCs "will be utilized during all [CERT] activations and follow the policy as outlined in the [BWC] directive."[97]

309.  Pursuant to the BWC Directive, BWCs must be worn on an officer's "upper front torso of the uniform/clothing, attached to the outermost layer of clothing, and pursuant to the

---

[95] N.Y. State Dep't of Corr. and Cmty. Supervision, *Directive: Body-Worn Camera (BWC)*, https://doccs ny.gov/system/files/documents/2025/02/4943.pdf.
[96] *Id.*
[97] *Id.*

43

Directive, "all uniformed staff shall be trained in the wearing and operation of the BWC."[98]

310. Pursuant to the BWC Directive, all supervisors are required to "ensure that any staff they encounter have their BWC powered on at all times and activated when interacting and/or escorting incarcerated individuals."[99]

311. According to the BWC Directive, DOCCS has a "zero-tolerance policy for those staff who fail to abide by the policies and procedures. . . regarding the use of a BWC."[100]

312. Pursuant to the BWC Directive, "on a weekly basis," Superintendents at facilities with a fully deployed or partially deployed BWC program, are required to "randomly review a total of 20 videos from different BWCs and tours."[101]

313. The Superintendent will address any department policy violations, including making a referral to OSI and/or the BLR, if necessary."[102]

314. Defendants D'Amore, Hilton, and Martuscello took no steps to ensure that the On-Scene Defendants who were issued BWCs wore and activated them during every shift at Mid-State, as required.

315. According to the WilmerHale Report, the firm's review "did not identify any uniform, systemwide protocol for facility or for DOCCS leadership to track adherence to these BWC policies or to effectively review and analyze BWC footage."[103]

316. The WilmerHale Report went on to note that "[t]he use of BWC, and the consistency with which staff activate them across shifts, was difficult to assess with confidence

---

[98] Id.
[99] Id.
[100] Id.
[101] Id.
[102] Id.
[103] WilmerHale Report, *supra* note 2, at 177.

44

because DOCCS does not track or report failures to activate in a way that allows meaningful shift-by-shift review."[104]

317.    Defendants D'Amore, Hilton, and Martuscello took no steps to ensure that the On-Scene Defendants received training on the wearing and operation of their BWCs, as required.

318.    Defendant Hilton did not conduct a weekly review of twenty videos from different BWCs, as required.

*Defendants D'Amore, Hilton and Martuscello Were Aware of and Deliberately Indifferent to the Risk of Harm Posed by CERT Officers*

319.    At all times relevant to this Complaint, Defendants D'Amore, Hilton, and Martuscello were personally aware of the serious risk of harm that Corrections Emergency Response Team units ("CERT Units") across DOCCS facilities, including at Mid-State, posed to incarcerated individuals like Mr. Abdul-Matin.

320.    The violence and unchecked abuse by CERT officers across DOCCS facilities is well-known and thoroughly documented.

321.    In November 2022, CERT officers savagely beat at least twenty-six incarcerated individuals at Sing Sing Correctional Facility.[105]

322.    During this attack, CERT officers at Sing Sing ordered incarcerated individuals to strip to their boxer shorts, punched and kicked them, grabbed their genitals, slammed their heads against walls or floors, pepper sprayed their eyes and mouths, and burned them on nearby radiators.[106]

---

[104] *Id.*
[105] Benjamin Weiser, *At Sing Sing, Prisoners' Charges of Brutal Beatings Prompt U.S. Inquiry,* N.Y. Times (Feb. 23, 2023), https://www.nytimes.com/2023/02/23/nyregion/sing-sing-beatings-investigation.html.
[106] *Id.*

45

323.    Throughout the attack, the CERT officers declared "stop resisting" and "this is our house."[107]

324.    Travis Matthews, one of the incarcerated individuals at Sing Sing who was viciously beaten by CERT officers stated that, as they walked him down the gallery, "CERT officers took turns punching me in the face" and that he saw officers "do the same thing" to three other inmates.[108]

325.    In October 2023, CERT officers violently abused and tortured approximately forty-six incarcerated individuals at Green Haven Correctional Facility, including beating them, slamming their heads against lockers, spraying them with OC spray, gouging their eyes, and kicking their genitals.[109]

326.    During this assault, Green Haven CERT officers marched through the prison chanting "Whose house? Our house."[110]

327.    These chants were echoed in Defendant Dundon's directive to "Respect these guys' houses," when speaking with Mr. Abdul-Matin after his assault.

328.    Several of the incarcerated individuals beaten by CERT officers at Green Haven were subsequently taken to Great Meadow Correctional Facility, where CERT officers proceeded to waterboard them.[111]

329.    Sean Chung, a former inmate at Marcy Correctional Facility experienced numerous beatings by CERT officers.

---

[107] *Id.*

[108] *Id.*

[109] *Taylor v. State of New York*, Claim No. E23-5142 (N.Y. Ct. Cl., 2023); *see Wright v. State of New York*, Claim No. E23-5143 (N.Y. Ct. Cl., 2023); *see also* Blaise Gomez, *46 Green Haven Prisoners File Lawsuit Against NYS Alleging Abuse and Torture During Lockdown Searches*, NEWS12 Long Island, https://westchester news12.com/46-green-haven-prisoners-file-lawsuits-against-nys-alleging-abuse-and-torture-during-lockdown-searches.

[110] *Id.*

[111] *Id.*

330. Mr. Chung explained that "when CERT comes in, there's nothing you can do" and that "you're going to be hurt badly, and it's not a regular beating. It's not like you had a fistfight at the bar. This is a different kind of whooping."[112]

331. Ronald Anderson, another former inmate at Marcy, echoed Mr. Chung's sentiments and said the CERT Unit at Marcy is known as the "demon squad" and has a reputation for abuse. Mr. Anderson reported being beaten by CERT officers at Marcy, who punched him numerous times in his rib cage while he was handcuffed on his knees.[113]

332. CERT officers have been involved in numerous incidents of abuse and violence against incarcerated individuals at Mid-State.

333. As detailed *infra* in this Complaint, CERT officers at Mid-State violently beat Christopher Quiles on February 28, 2025, only *one day* after CERT officers beat Mr. Abdul-Matin and only *one day* before CERT officers beat Mr. Nantwi to death.

334. Defendants D'Amore, Hilton, and Martuscello were personally aware of and deliberately indifferent to the substantial risk of serious harm posed by CERT officers across DOCCS facilities, including at Mid-State.

335. One of Defendant D'Amore's primary responsibilities is supervision of CERT units.

336. Defendants D'Amore, Hilton, and Martuscello took no meaningful action to protect incarcerated individuals at Mid-State, including Mr. Abdul-Matin, from this risk of harm posed by CERT officers.

---

[112] Charles Lane, *NY Prison Emergency Teams Face Scrutiny After Fatal Beating. Inmates Call them the "Demon Squad"*, Gothamist (Jan. 5, 2025), https://gothamist.com/news/ny-prison-emergency-teams-face-scrutiny-after-fatal-beating-inmates-call-them-the-demon-squad.
[113] *Id.*

*Supervisory Defendants Were Aware of and Deliberately Indifferent to the Heightened Risk of*

*Harm to Incarcerated People Caused by the Wildcat Strikes*

337.　On February 17, 2025, correction officers at two DOCCS facilities abandoned their posts and began an illegal "wildcat" strike.[114]

338.　Striking officers claimed to be protesting staffing shortages in DOCCS facilities, forced overtime, and dangerous working conditions.[115]

339.　Striking officers also demanded the repeal of the Humane Alternatives to Long-Term (HALT) Solitary Confinement Act, which sought to cap periods of solitary confinement for incarcerated individuals and to prohibit it for certain populations.[116]

340.　Within a few days, more than ten thousand correction officers in nearly every prison across New York State were participating in the unsanctioned strike.[117]

341.　The strike violated state law as well as the officers' own collective bargaining agreement.

342.　The striking officers' disregard for state law, their own collective bargaining agreement, and the safety of incarcerated individuals reflects the longstanding pattern, practice, and custom across DOCCS facilities of allowing officers to disobey rules with impunity.

343.　On February 19, 2025, Governor Hochul issued an executive order declaring a state of emergency and deploying approximately 7,000 National Guard troops to staff DOCCS facilities.

344.　The strike persisted until March 10, 2025.

---

[114] *See* Chelsia Rose Marcius, *New Deal Reached to End Wildcat Strikes by N.Y. Prison Guards*, N.Y. Times (Mar. 9, 2025), https://www.nytimes.com/2025/03/09/nyregion/new-york-prison-strike-deal.html.

[115] *Id.*

[116] *See* Chris Gelardi, *The Biggest Issue Behind the New York Prison Guard Strike*, N.Y. Focus (Feb. 20, 2025), https://nysfocus.com/2025/02/20/biggest-issue-behind-new-york-prison-guard-strike.

[117] *See* Maria Cramer, *N.Y. Prisons Loosen Solitary Confinement Rules as Wildcat Strikes Spread*, N.Y. Times (Feb. 20, 2025), https://www.nytimes.com/2025/02/20/nyregion/new-york-prison-strikes-solitary-confinement.html?searchResultPosition=2.

345. At least nine incarcerated individuals died during the illegal strike, including Mr. Nantwi at Mid-State, two men at Auburn Correctional Facility who did not receive timely, necessary medical treatment, and two men at Sing Sing Correctional Facility who died by suicide when no officers were present to intervene.[118]

346. Defendants D'Amore, Hilton, and Martuscello were aware of the staffing shortages at Mid-State from February 17, 2025 to March 10, 2025, caused by the strike.

347. Defendants D'Amore, Hilton, and Martuscello were aware of the increased risk of violence by correction officers towards incarcerated individuals caused by the strike.

348. Defendants D'Amore, Hilton, and Martuscello took no meaningful action to protect incarcerated individuals at Mid-State, including Mr. Abdul-Matin, from the increased risk of harm posed by the strike.

*Defendants and the Mid-State CERT Unit Continue their Rampage of Unchecked Violence*

349. After the assault on Mr. Abdul-Matin, Mid-State CERT members continued their parade of brutality by attacking Mr. Quiles on February 28, 2025, and Mr. Nantwi on March 1, 2025.

350. The attacks on Mr. Abdul-Matin, Mr. Quiles, and Mr. Nantwi corroborate CANY's findings about Mid-State and reflect the longstanding pattern, practice, and custom of excessive force by correction officers against incarcerated people at Mid-State.

---

[118] *See* Ed Shanahan, *2,000 Striking N.Y. Prison Officers Fired and Barred From Public Jobs*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/nyregion/new-york-prison-strike-officers-fired html?searchResultPosition=10; Jan Ransom, *Seven Prisoners Die as New York Guard Strikes Cause Widespread Disarray*, N.Y. Times (Mar. 4, 2025), https://www nytimes.com/2025/03/04/nyregion/ny-prison-strike-guards html.

351.    On February 28, 2025—*one day* after Mr. Abdul-Matin was beaten and *one day* before Mr. Nantwi was killed—multiple officers on the Mid-State CERT team, including Defendants Chandler and Bartlett, brutally attacked Mr. Quiles.[119]

352.    The officers, including Defendants Chandler and Bartlett, beat Mr. Quiles' body, face, and head with their fists and batons.[120]

353.    The officers, including Defendants Chandler and Bartlett, pepper sprayed Mr. Quiles during their assault on him; they told him he had a choice: either let them pepper spray him in the third degree burns he had or they would kill him and make it look like an accident.[121]

354.    None of the officers involved in Mr. Quiles' beating, including Defendants Chandler and Bartlett, were wearing BWCs, despite being required to do so.[122]

355.    On March 1, 2025—*one day* after the attack on Mr. Quiles and *two days* after the attack on Mr. Abdul-Matin—multiple members of the Mid-State CERT team, including Defendants Bartlett, Chandler, Ferrone, Klemick, Levi, Russell, and Sheppard, participated in or failed to intervene to prevent the fatal attack on Mr. Nantwi.[123]

356.    The officers beat Mr. Nantwi's body, face, and head with their fists, batons, and boots causing him to lose consciousness.[124]

---

[119] *New Details Uncovered in New York State Prison Beating Scandal*, NBC N.Y. (May 1, 2025), https://youtu.be/jJipaF5hr_c?si=-dKnNFBhueEuhsUm; *see generally* WilmerHale Report, *supra* note 2, at 33-5.
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] Complaint, *Estate of Messiah Nantwi v. Bartlett*, No. 9:25-cv-775 (N.D.N.Y. June 17, 2025), ECF No. 1; Casey Pritchard, *Correctional officer in Messiah Nantwi case pleads guilty to two charges*, Utica Observer Dispatch (May 30, 2026), https://www.uticaod.com/story/news/local/2025/05/30/messiah-nantwi-death-mid-state-corrections-officer-pleads-guilty/83949749007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z113831p115950c115950e007800v113831d--38--b--38--&gca-ft=144&gca-ds=sophi.
[124] Complaint ¶¶ 56-70, *Estate of Messiah Nantwi v. Bartlett*, No. 9:25-cv-775 (N.D.N.Y. June 17, 2025), ECF No. 1; Dave Collins, *Former prison guard pleads guilty to manslaughter in New York inmate's fatal beating*, Associated Press (May 4, 2026), https://apnews.com/article/inmate-death-new-york-guard-manslaughter-f0d26dc176e99b6f7d6bdf9952a6bc4c; *Former correction officer found guilty of 5 counts in Mid-State prison death*,

357.    After viciously beating Mr. Nantwi in his room, the officers dragged his handcuffed, unconscious, and bloodied body to the facility's infirmary where he was left in a holding cell.[125]

358.    Mr. Nantwi was later transported to a hospital where he was pronounced dead.[126]

359.    According to the medical examiner, Mr. Nantwi's cause of death was attributed to traumatic brain injuries from violent blows to his head, and he also suffered at least sixty-nine blows to his body.[127]

360.    None of the officers involved in Mr. Nantwi's fatal beating, including Defendants Bartlett, Chandler, Ferrone, Klemick, Levi, Russell, and Sheppard, were wearing properly activated BWCs during the beating, despite being required to do so.[128]

361.    According to a later indictment, correction officers and sergeants conspired to cover up the killing.[129]

362.    In particular, the indictment alleged that supervisors "had key roles in the cover-up . . . one sergeant directed the officers to plant a weapon in Mr. Nantwi's room, one sergeant assisted in the plot to plant the weapon, one sergeant provided a written memorandum

Spectrum 1 News (Apr. 1, 2026), https://spectrumlocalnews.com/nys/central-ny/public-safety/2026/03/25/murder-trial-for-former-mid-state-officer-underway.

[125] Complaint ¶ 49, *Estate of Messiah Nantwi v. Bartlett*, No. 9:25-cv-775 (N.D.N.Y. June 17, 2025), ECF No. 1; Dave Collins, *Former prison guard pleads guilty to manslaughter in New York inmate's fatal beating*, Associated Press (May 4, 2026), https://apnews.com/article/inmate-death-new-york-guard-manslaughter-f0d26dc176e99b6f7d6bdf9952a6bc4c; *Former correction officer found guilty of 5 counts in Mid-State prison death*, Spectrum 1 News (Apr. 1, 2026), https://spectrumlocalnews.com/nys/central-ny/public-safety/2026/03/25/murder-trial-for-former-mid-state-officer-underway; Michael Hill & Dave Collins, *NY prison guards beat an inmate to death then tried to cover it up, prosecutors say*, Associated Press (Apr. 16, 2025), https://apnews.com/article/new-york-prison-guards-inmate-death-5ec50359f3168e7115028c26784fc0af.

[126] Jane Ransom, 2 Guards Charged With Murder in Beating Death of Prisoner in New York, N.Y. Times (Apr. 16, 2025), https://www.nytimes.com/2025/04/16/nyregion/messiah-nantwi-beating-death-charges.html.

[127] WilmerHale Report, *supra* note 2, at 1, 15.

[128] Complaint ¶ 57, *Estate of Messiah Nantwi v. Bartlett*, No. 9:25-cv-775 (N.D.N.Y. June 17, 2025), ECF No. 1; Casey Pritchard, *Day 3 of Messiah Nantwi case starts with more testimony*, Utica Observer Dispatch (Mar. 25, 2026), https://www.uticaod.com/story/news/crime/2026/03/25/testimony-continues-on-day-3-of-messiah-nantwi-case/89303788007/.

[129] WilmerHale Report, *supra* note 2, at 1.

that described the sergeant witnessing no force being used, despite being in clear view of the beating (and turning the BWC recording device away from the altercation), and one sergeant mopped up the blood in Mr. Nantwi's cell to obscure the crime scene."[130]

363. In April 2025, an indictment was unsealed charging two officers with second-degree murder, five officers with first-degree manslaughter, two officers with second-degree manslaughter, six officers with gang assault, nine officers with offering a false instrument for file, four officers with tampering with physical evidence, and eight officers with conspiracy.[131]

364. Fourteen correctional staff publicly pleaded guilty in connection with the killing of Mr. Nantwi.[132]

365. Defendant Bartlett pleaded guilty to hindering prosecution, falsifying business records, and an additional charge unrelated to the killing of Mr. Nantwi and was sentenced to three years in jail.[133]

366. Defendant Chandler pleaded guilty to gang assault and was sentenced to four years in prison.[134]

367. Defendant Ferrone pleaded guilty to tampering with physical evidence and received a three-year conditional discharge.[135]

---

[130] WilmerHale Report, *supra* note 2, at 16; *see also* Indictment, *People v. Levi et al.*, Indictment No. I 2025-090-1-2-3-4-5-6-7-8-9-10, Oneida Cnty. Ct. (N.Y. 2025).

[131] WilmerHale Report, *supra* note 2, at 17.

[132] *See Id.* at 18. As of the filing of this complaint, fourteen correctional staff had pled guilty, and Jonah Levi was found guilty at trial.

[133] *4 former Mid-State correction officers sentenced in prison death case*, Spectrum 1 News (June 17, 2026), http://spectrumlocalnews.com/nys/central-ny/news/2026/06/17/4-former-mid-state-correction-officers-sentenced-in-prison-death-case.

[134] Casey Pritchard, *Mid-State COs Eck, Chandler enter plea bargains in Nantwi death*, Utica Observer Dispatch (May 13, 2026), https://www.uticaod.com/story/news/crime/2026/05/13/mid-state-cos-eck-chandler-enter-plea-bargains/90061121007/.

[135] Matthew Benninger, *Mid-State Officer to avoid prison time for taking plea deal in inmate murder case*, CNYCentral (Oct. 1, 2025), https://cnycentral.com/news/local/mid-state-officer-to-avoid-prison-time-for-taking-plea-deal-in-inmate-murder-case-robert-brooks-messiah-nantwi-marcy-death.

368. Defendant Klemick pleaded guilty to offering a false instrument for filing and was sentenced to nine months in jail.[136]

369. Defendant Levi pleaded not guilty and was later convicted of manslaughter, gang assault, conspiracy, and filing a false instrument and sentenced to twenty-five years in prison.[137]

370. The WilmerHale Report later commissioned by DOCCS found that these incidents are "emblematic of systemic issues at [Mid-State and Marcy], including excessive use of force, officer misconduct, accountability, oversight, and culture."[138]

371. The report went on to state that the incidents described therein "demonstrate that several of the officers allegedly involved in the killings of Mr. Brooks and Mr. Nantwi had a substantiated history of misconduct at Marcy and Mid-State," but "were allowed to remain on the job," and that "the days leading up to the killing of Mr. Nantwi appear to have been marked by repeated episodes of alleged officer assault, particularly by CERT officers."[139]

372. The report specifically noted that incidents at Mid-State on February 27-28, 2025, indicated "a clear escalation of violence by CERT at Mid-State during the illegal strike," and that the involvement of officers who were not implicated in the killings of Mr. Brooks or Mr. Nantwi indicated that "those assaults were not isolated or based on the misconduct of just 'a few bad apples.'"[140]

[136] *4 former Mid-State correction officers sentenced in prison death case*, Spectrum 1 News (June 17, 2026), http://spectrumlocalnews.com/nys/central-ny/news/2026/06/17/4-former-mid-state-correction-officers-sentenced-in-prison-death-case.

[137] Joleen Ferris, *25 Years in Prison for Ex-Corrections Officer in Messiah Nantwi's Death*, (May 27, 2026), WKTV News Channel 2, https://www.wktv.com/news/crime/25-years-in-prison-for-ex-corrections-officer-in-messiah-nantwis-death/article_f84dd79c-3940-4f65-b40b-284cab233603.html.

[138] WilmerHale Report, *supra* note 2, at 35.

[139] *Id.*

[140] *Id.* at 35-36.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983 – Eighth Amendment**
**Excessive Force**
**(Against All On-Scene Defendants)**

373. Plaintiff repeats and realleges each allegation above as if fully set forth herein.

374. At all relevant times, the On-Scene Defendants acted under color of state law.

375. As described more fully above, the On-Scene Defendants violated Mr. Abdul-Matin's Eighth Amendment right to be free from excessive force through their use of excessive force and/or their failure to intervene to prevent their fellow On-Scene Defendants' use of excessive force against Mr. Abdul-Matin.

376. Information known to date demonstrates that the use of excessive force included, at minimum, punching, hitting, kicking, and otherwise striking various parts of Mr. Abdul-Matin's person, including his body, head, genitals, and face.

377. As described more fully above, the degree of force used against Mr. Abdul-Matin was objectively unreasonable because Mr. Abdul-Matin was unarmed and posed no security risk.

378. The On-Scene Defendants' attack on Mr. Abdul-Matin served no legitimate penological or government interest and was intended to injure him.

379. The On-Scene Defendants each had a legal duty to intervene to prevent or halt their fellow On-Scene Defendants' use of excessive force against Mr. Abdul-Matin.

380. The On-Scene Defendants each had a realistic opportunity to intervene during Mr. Abdul-Matin's beating.

381. The On-Scene Defendants were subjectively aware that Mr. Abdul-Matin's constitutional rights were being violated during the beating because they observed and heard Mr. Abdul-Matin.

382. The On-Scene Defendants failed to intervene to prevent or halt their fellow On-Scene Defendants' use of excessive force against Mr. Abdul-Matin.

383. Following the attack, the On-Scene Defendants conspired to issue Mr. Abdul-Matin a false misbehavior report and to submit false reports to their supervisors, demonstrating, among other things, their consciousness of guilt.

384. In the manner described more fully above, the On-Scene Defendants acted willfully, wantonly, recklessly, maliciously, and with depraved and deliberate indifference to Mr. Abdul-Matin's well-being.

385. In assaulting Mr. Abdul-Matin and/or failing to intervene, the On-Scene Defendants inflicted a cruel and unusual punishment and used unlawfully excessive force against Mr. Abdul-Matin in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

386. The misconduct described in this Count directly and proximately caused Mr. Abdul-Matin to suffer extreme emotional fear, excruciating pain, and serious bodily injury.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – Eighth Amendment Conspiracy to Violate Civil Rights
### (Against All On-Scene Defendants)

387. Plaintiff repeats and realleges each allegation above as if fully set forth herein.

388. At all relevant times, the On-Scene Defendants acted under color of state law.

55

389. As described more fully above, the On-Scene Defendants conspired and acted in concert to violate Mr. Abdul-Matin's Eighth Amendment rights to be free from excessive force.

390. On or about February 27, 2025, the On-Scene Defendants entered into an explicit and/or tacit agreement, conspired, and acted in concert with each other to use excessive force against Mr. Abdul-Matin, to issue him a fraudulent misbehavior report, to concoct a false narrative of Mr. Abdul-Matin's injuries, and to cover up each other's misconduct.

391. On or about February 27, 2025, the On-Scene Defendants used malicious, sadistic, gratuitous, excessive, brutal, objectively unreasonable, and unconscionable force on Mr. Abdul-Matin, and/or failed to prevent other officers from doing so despite having a realistic opportunity to intervene.

392. In furtherance of the conspiracy to contribute to and cover up the acts of brutality against Mr. Abdul-Matin, the On-Scene Defendants acted overtly to intimidate Mr. Abdul-Matin in an effort to keep him quiet, to issue him a fraudulent misbehavior report and isolate him in solitary confinement, to concoct a false narrative that Mr. Abdul-Matin acted in violation of correctional rules and that their use of force was justified, which they later told to investigators, and to cover up each other's misconduct by filing false reports and making false statements.

393. The On-Scene Defendants' actions, committed in furtherance of their goal, inflicted a cruel and unusual punishment against Mr. Abdul-Matin in violation of his rights under the Eighth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment to the United States Constitution.

394. In the manner described more fully above, each of the On-Scene Defendants acted knowingly, intentionally, willfully, wantonly, recklessly, maliciously, and with depraved and deliberate indifference to Mr. Abdul-Matin's well-being.

395. The misconduct described in this Count directly and proximately caused Mr. Abdul-Matin to suffer extreme emotional terror, excruciating pain, and serious bodily injury.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983 – Eighth Amendment**
**Failure to Protect**
**(Against Defendants Martuscello, D'Amore and Hilton)**

396. Plaintiff repeats and realleges each allegation above as if fully set forth herein.

397. At all relevant times, the On-Scene Defendants acted under color of state law.

398. As described more fully above, Defendants D'Amore, Hilton, and Martuscello, and other as yet identified supervisory individuals, violated Mr. Abdul-Matin's Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from a substantial risk of serious harm.

399. As described more fully above, Defendants D'Amore, Hilton, and Martuscello knew that DOCCS' culture of violence and cover-ups posed a substantial risk of serious harm to incarcerated individuals like Mr. Abdul-Matin.

400. As described more fully above, Defendants D'Amore, Hilton, and Martuscello knew that the members of DOCCS' CERT Units, including the Mid-State CERT Unit, posed a substantial risk of serious harm to incarcerated individuals like Mr. Abdul-Matin.

401. Defendants D'Amore, Hilton, and Martuscello possessed this knowledge not only from their own years of experience working in supervisory roles within DOCCS, but also through independent reports, investigative reporting, jury verdicts, and criminal

57

prosecutions concerning DOCCS correction staff, including those at Mid-State, as described above.

402. Defendants D'Amore, Hilton, and Martuscello acted with deliberate indifference to this risk of harm by failing to take reasonable steps to mitigate the risk of harm to incarcerated individuals like Mr. Abdul-Matin.

403. Defendants D'Amore, Hilton, and Martuscello acted with deliberate indifference to the risk of harm posed by members of the CERT Units by failing to take reasonable steps to mitigate the risk of harm to incarcerated individuals like Mr. Abdul-Matin.

404. Defendants D'Amore, Hilton, and Martuscello were personally responsible for ensuring the safety of incarcerated individuals under their care and custody, including Mr. Abdul-Matin.

405. Defendants D'Amore, Hilton, and Martuscello had the power and responsibility to implement and enforce policies and practices to protect incarcerated people at Mid-State from the use of excessive force by staff, including the force used against Mr. Abdul-Matin.

406. Defendants D'Amore, Hilton, and Martuscello were personally involved in the attack of Mr. Abdul-Matin because, as a direct and proximate cause of the deliberate indifference described in this Count, the On-Scene Defendants were emboldened to savagely beat Mr. Abdul-Matin, confident that their misconduct would never be subject to any meaningful scrutiny or discipline.

407. The misconduct described in this Count directly and proximately caused Mr. Abdul-Matin to suffer extreme emotional terror, excruciating pain, and serious bodily injury.

58

## DAMAGES

408. Based upon the facts and legal claims set forth above, Mr. Abdul-Matin is entitled to an award of compensatory damages for his severe physical and emotional pain and suffering.

409. Based upon the facts and legal claims set forth above, and specifically the intentional, wanton, reckless, and grossly negligent conduct of the individual Defendants, Mr. Abdul-Matin is entitled to an award of punitive damages against Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against all Defendants for compensatory damages, punitive damages, and attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

59

Dated: Buffalo, New York
       August 12, 2026

PRISONERS' LEGAL SERVICES OF NEW YORK

By:       /s Andrew Stecker

Andrew Stecker
14 Lafayette Square, Suite 510
Buffalo, NY 14203

Hallie E. Mitnick
Megan Welch
114 Prospect Street
Ithaca, NY 14850

Sara Jensen
50 Beaver Street, 5th Floor
Albany, NY 12207

*Attorneys for Plaintiff*

60